**Joseph M. A. J. DAWSON, Plaintiff,**

v.

**G. MALINA, INC. and Gerald Malina, Defendants.**

No. 76 Civ. 824.

United States District Court,
S. D. New York.

Dec. 11, 1978.

Weil, Gotshal & Manges, New York City, for plaintiff; Kenneth Lemberger, Richard A. Rothman, New York City, of counsel.

Jon Emanuel, New York City, for defendants.

## OPINION

BONSAL, District Judge.

Plaintiff Joseph M. A. J. Dawson ("Dawson"), a resident of Jersey, Channel Islands, is suing defendants G. Malina, Inc. ("GMI"), a New York corporation, and Gerald Malina ("Malina"), a resident of New York, individually, for rescission, or alternatively, for damages for breach of warranty with respect to certain objects of Chinese art which Dawson purchased from GMI in 1974. This action was tried to the Court without a jury on April 25 and 27, and May 4, 9 and 11, 1978. The Court has jurisdiction over this action under 28 U.S.C. § 1332 based on the parties' diversity of citizenship.

In September, 1978, the Court held a conference with the parties. The Court suggested that in view of the differences of opinion amongst the expert witnesses who testified during the trial, it would be useful to obtain the testimony of an independent expert to be called by the Court to examine the objects involved and testify as to his findings, subject to cross examination by both counsel. By letter of October 23, 1978 plaintiff's counsel informed the Court that the parties did not wish to reopen the trial for this purpose.

The dispute arises from the purchase in 1974 of eleven objects of Chinese art by Dawson from GMI for a total purchase price of $105,400. The items purchased, which included both Chinese ceramics and jade sculptures, consisted of items Dawson had seen on the occasion of a visit to GMI on March 25, 1974 as well as items which Malina had recommended to him in correspondence between the two subsequent to his visit.

Malina shipped the objects to London in late September, 1974. However, when Dawson returned to London in the latter half of October, 1974, he learned that his taking possession of the objects in London could subject him to British customs regulations. Accordingly, Dawson requested and Malina (through his agent) agreed to have the goods forwarded to Dawson in Jersey, Channel Islands. The shipment arrived in Jersey, Channel Islands in late October, and on November 2, 1974 Dawson wrote to Malina acknowledging receipt of the goods in good condition.

Prior to leaving London for the Channel Islands, Dawson showed a photograph of the item which Malina had represented to be a Sung Chun yao vase, to a London art dealer, Mr. Bandini, of Eskenazi Ltd., and Mr. Bandini expressed doubt that the vase was an authentic Sung piece. Consequently, Dawson brought the vase with him on a subsequent trip to London and asked various experts for their opinion as to whether the vase was an authentic Sung piece. According to Dawson, it was the conclusion of these experts that the vase was not in fact of the period of the Sung Dynasty.

On November 25, 1974, Dawson visited Malina in New York bringing with him the large ceramic vase and a porcelain mirror-black vase, another one of the items he had purchased from GMI. Dawson informed Malina of the conclusions reached by the experts whom he had asked to examine the vase in London and stated that on the basis of those evaluations he wished to return the vase and obtain a refund of the $35,000 he had paid for it. In addition, Dawson sought a refund of $2,500 for the porcelain mirror-black vase. Dawson's desire to return this latter object and obtain a refund did not involve any question as to the accuracy of the period to which it had been ascribed by Malina. Rather, it appears that the sole reason for this returning of the porcelain mirror-black vase, which had been purchased sight unseen on the basis of Malina's recommendation in the course of their correspondence, was that he disliked the piece

when he had occasion to view it personally after the shipment arrived in the Channel Islands.

Although Malina initially agreed to give Dawson a refund for both of the items, on November 26, 1974 Malina refused to give a refund for the large ceramic vase. Malina explained that after closing the gallery the previous evening he had taken the vase to a Mr. Cox, whom he considered an expert on Chinese ceramics. Malina told Dawson that Cox had agreed with his own opinion that the vase dated back to the Sung Dynasty. In view of the difference of opinion between Malina and Cox on the one hand, and the experts in London who had examined the vase at Dawson's request on the other hand, Dawson suggested that the vase be submitted for evaluation to experts in New York and that they both agree to abide by the decision of these experts. Malina, however, declined Dawson's suggestion, and Dawson left the premises of GMI taking the vase with him. Since Dawson was scheduled to leave New York shortly thereafter, he left the vase with a friend in New York, asking her to take the vase to experts in New York for an appraisal.

In early December, 1974, Malina wrote to Dawson, then in Hong Kong, informing him that he had applied the $2,500 refund on the mirror-black vase toward the costs of freight and insurance incurred by GMI in shipping the objects Dawson had purchased, stating that the total charges of freight and insurance amounted to $2,747. Malina's letter reflected a balance owing GMI by Dawson of $247. Malina's application of the $2,500 refund is a subject of dispute between the parties.

Dawson returned to his home in Jersey, Channel Islands in late January, 1975. During February and March, 1975, he brought the remaining nine objects that he had purchased from Malina to London to have them appraised by experts there. Based on the results of these appraisals, Dawson turned this matter over to his London solicitor in March, 1975. In October, 1975, Dawson's London solicitor met with Malina at the premises of GMI and based upon the appraisals which had been rendered by the experts in London demanded that Malina accept the return of the objects which had been purchased by Dawson and which, according to Dawson's solicitor, had been found not to conform to the attributions made by Malina. As a result of Malina's refusal to accede to this demand, Dawson commenced this action against GMI and Malina on February 19, 1976.

At the outset of trial defendants agreed to accept the return of four ceramic works which Dawson had purchased from GMI and to refund Dawson the purchase price.[1] Therefore, only five objects remain in dispute as the subjects of plaintiff's breach of warranty claims. These objects and the price paid by plaintiff for each are as follows:

| | |
|---|---|
| (1) the large blue ceramic vase | $35,000; |
| (2) the jade lotus bowl | $13,500; |
| (3) the jade peach-tree carving | $ 3,400; |
| (4) the jade lotus vase | $21,500; and |
| (5) the jade pilgrim vase | $21,000. |

Each object and the warranties made will be discussed in detail later in this opinion.

At trial, both Dawson and Malina testified as to the events surrounding the purchase of the disputed objects. Additionally, experts in the field of art testified for both sides.

Dawson called James Lally, who is employed by Sotheby Parke Bernet Inc. in New York, to give testimony as to his opinion of the objects in issue here. The Court also received in evidence relevant portions of deposition testimony of Miss Margaret Medley, who is Curator of the Percival David Foundation of the University of London, and of Miss Suzanne Valenstein, who is Associate Curator of the Far Eastern Art Department of the New York Metropolitan Museum of Art.

Defendants called the following expert witnesses to testify as to their opinion of the objects which were the subjects of this dispute: Anthony duBoulay, employed by

---

1. In stipulating to take back these four ceramic objects, defendants emphasized that they were not conceding that the attributions made by Malina were inaccurate in any respect.

Christie, Manson & Woods as a director of its New York branch and head of Decorative Arts Department; Robert Sistrunk, a dealer in works of Chinese art; Martin Frankel, a private collector of jade; Marilyn Priem, an appraiser of decorative arts and antiques; and Roger Priem, also an appraiser of decorative arts and antiques.

*The Issues*

The first issue involves the question of whether defendants are liable to plaintiff for breach of warranty in connection with the sale of the five items described above.

The second issue involves the question of whether there was an oral agreement between Dawson and Malina that the cost of freight for transport of these items from New York to London and the cost of insurance to cover these items while in transit from New York to London, while in storage in London, and while in transit from London to Jersey, Channel Islands, were to be borne by Malina and GMI, as Dawson contends, or whether these costs were to be the responsibility of Dawson, as defendants contend. Ultimately at issue here is the propriety of Malina's application of the $2,500 refund owing to Dawson by reason of his return of the porcelain mirror-black vase toward reimbursement of expenses for freight and insurance which were initially paid by defendants.

The third issue is whether Malina, individually (in addition to the corporate defendant GMI) can be held jointly and severally liable in his individual capacity in the event Dawson prevails on either or both of the above issues.

2. Regardless of whether or not defendants intended to abandon this claim, the claim for defamation must fail. As indicated above, since no proof was offered on this issue at trial apart from the fact that the letters were written, it is clear the defendants have not carried their burden of proof in establishing that they were harmed thereby.

3. Although Dawson also relies on § 2-313 of the New York Commercial Code (McKinney 1964) which provides for the creation of express warranties, any benefit that Dawson might derive from this provision is embraced by § 219–c of the New York General Business Law set out in

■ By way of counterclaim, defendants allege that certain letters written by Dawson in February 1975 to the heads of two art associations in the United States to enlist their assistance in his efforts to obtain a refund for the large blue ceramic vase (represented by defendants to be a Sung piece) were defamatory; and whether these allegedly defamatory statements resulted in any damage to the defendants. Although this counterclaim was raised by defendants in their answer and the pretrial order submitted to the Court, the only evidence on this issue at trial was that Dawson did in fact write the letters. No proof was offered as to any damages defendants might have suffered in consequence of these letters; nor was there any mention of this claim in the post-trial materials submitted by defendants. Accordingly, the Court will consider the counterclaim to have been abandoned by defendants.[2]

## DISCUSSION

*I. Plaintiff Dawson's Claim for Breach of Warranty*

■ In suing for breach of warranty, Dawson relies primarily[3] upon § 219–c of the New York General Business Law, which provides in pertinent part as follows:

"§ 219–c. Express warranties.

"Any provision in any other law to the contrary notwithstanding: 1. Whenever an art merchant, in selling or exchanging a work of fine art, furnishes to a buyer of such work who is not an art merchant, a written instrument which, in describing the work, identifies it with any author or

the text above. Indeed, § 219–c was enacted at least in part to eliminate questions as to whether an art dealer's representations with respect to the authorship of a particular work of art were to be considered an affirmation of a fact, in which event the description would create an express warranty under the Uniform Commercial Code, or merely the expression of the dealer's opinion which would not give rise to such a warranty. *See* Comment, *Regulation of the New York Art Market: Has the Legislature Painted Dealers into a Corner?*, 46 Fordham L.Rev. 939, 953-59 (1978).

authorship, such description (i) shall be presumed to be part of the basis of the bargain and (ii) shall create an express warranty of the authenticity of such authorship as of the date of such sale or exchange. Such warranty shall not be negated or limited because the seller in the written instrument did not use formal words such as 'warrant' or 'guarantee' or because he did not have a specific intention or authorization to make a warranty or because any statement relevant to authorship is, or purports to be, or is capable of being merely the seller's opinion.

"2. In construing the degree of authenticity of authorship warranted as aforesaid, due regard shall be given to the terminology used in describing such authorship and the meaning accorded to such terminology by the customs and usage of the trade at the time and in the locality where the sale or exchange took place. . . ." (McKinney Supp. 1977.)[4]

Citing the above provision, Dawson contends that Malina and GMI expressly warranted that the objects were in conformity with the description provided by Malina in letters, invoices, and the final bill of sale, which were sent by Malina. Dawson contends that Malina's descriptions as to these five objects were inaccurate in material respects and that, therefore, Malina and GMI are liable for breach of warranty.

Defendants appear to concede that the descriptions of the objects cited by Dawson constitute express warranties under § 219–c of the New York General Business Law. Nevertheless, defendants deny that the representations made with respect to these objects were inaccurate in any significant respect, and maintain that they are not liable

for breach of warranty. Thus, the issue presented here is whether the five objects which still remain in dispute were in fact what they were represented to be by defendants.

Dawson maintains that in order to prevail on his claim for breach of warranty here he need only establish that the works of art failed in any respect to conform to the descriptions which, under the New York General Business Law § 219–c, defendants warranted as being accurate. Stated conversely, Dawson argues that unless it can be found that these works of art were unqualifiedly what defendants represented each of them to be, he is entitled to relief for breach of warranty. Dawson seeks adoption of this standard arguing that defendants unqualifiedly and unequivocally represented these pieces to have been made during specific periods of Chinese antiquity, aware that such attributions have special significance in terms of the quality of workmanship and the value of the piece. Dawson contends that when measured against this standard the expert testimony of the witnesses called by both plaintiff and defendants establishes defendants' breach of warranty with respect to each of these items. Dawson points to the testimony of the experts whom he called to testify at trial as conclusively demonstrating that the objects in issue here were not in conformity with defendants' descriptions. Dawson further maintains that the testimony of defendants' experts, taken as a whole, fails to establish that the pieces were unqualifiedly of the period to which they were attributed by defendants.[5]

Defendants, on the other hand, urge the adoption of a less stringent standard. Citing that portion of § 219–c of the New York General Business Law which directs that

---

**4.** It is clear that defendants GMI and Malina fall within the definition of "art merchant" set forth in § 219–b of the New York General Business Law, and that the objects of art involved in this action constitute "fine art" within the meaning of this statute. It is likewise clear that plaintiff Dawson is a "buyer . . . not an art merchant"; Dawson's testimony that he maintained his collection for his own personal pleasure (as opposed to for commer-

cial purposes) was not countered by any evidence offered by defendants.

**5.** Dawson also points to the fact that with the exception of duBoulay all of the experts called by defendants testified that they are either personal or social acquaintances of Malina. The Court has considered the possible bias of these witnesses based on their relationship to Malina in considering the opinions that they expressed.

"[i]n construing the degree of authenticity of authorship warranted as aforesaid, due regard shall be given to the terminology used in describing such authorship and the meaning accorded to such terminology by the customs and usage of the trade at the time and in the locality where the sale or exchange took place," defendants contend that any standard applied here must take cognizance of what the experts testified was the inexactitude of the process of attribution where works such as those in issue here are involved. Accordingly, defendants maintain that unless Dawson has conclusively established by a preponderance of the evidence, that the representations made by them were in fact inaccurate, his claim for breach of warranty with respect to these pieces must fail.

Neither side has cited nor has the Court discovered any reported cases involving the precise legal question presented here. There do not appear to be any cases brought under § 219–c of the New York General Business Law; nor do there appear to be any cases based either on the Uniform Commercial Code or common law fraud or misrepresentation which would provide the Court with guidance on this issue.

▮ In considering the standard to be applied in determining whether the objects of art in issue were in accord with the descriptions furnished by defendants, the Court must bear in mind that, as the experts called by both plaintiff and defendants conceded, the process of attributing any of the works of art involved here to a particular period of Chinese antiquity is by its very nature an inexact science. As the testimony of all of the experts makes clear, a determination as to the proper attribution for any of these pieces is to a substantial extent a subjective judgment based upon whether an expert finds a given piece to be aesthetically consistent with other works of the period on the basis of such elusive characteristics as the quality, character, form or "feel" of the piece. For these reasons, it is obvious that any attempt to ascribe any of the works of art involved here to a specific period of Chinese history must necessarily be imprecise.

Accordingly, it would clearly be unjust for the Court to adopt the strict standard proposed by Dawson. Guided by what the Court conceives to be the spirit and purpose of the New York statute quoted above, it appears that the proper standard to be applied here in determining whether defendants are liable for breach of warranty is whether the representations furnished Dawson by Malina with respect to each of these objects can be said to have had a reasonable basis in fact, at the time that these representations were made, with the question of whether there was such a reasonable basis in fact being measured by the expert testimony provided at trial. Since the plaintiff has the burden of proof on the issue of breach of warranty, the issue presented here, when reduced to its simplest terms, is whether plaintiff Dawson has established by a fair preponderance of the evidence that the representations made by Malina were without a reasonable basis in fact at the time that these representations were made. The Court now turns to the five objects which are in dispute.

### 1. The Large Blue Ceramic Vase

▮ This vase (Plaintiff's Exhibit 13a) was represented by Malina in the final bill of sale as having the following attributions:

"Antique Chinese Chun yao vase in a modified pear shape, with the lower section in the form of lotus petals. It has a think opalecent [sic] glaze, in blue, with touches of lavender. It is 14¼″ high. Originally it was in the Samuel T. Peters collection, and was exhibited at the New York Metropolitan Museum of Art 1n [sic] March 1916. It was made in the Sung Dynasty, 960–1279 A.D." [6]

"Extremely rare antique Chinese Chun yao vase made in the Sung Dynasty, 960–1279 A.D.

6. The vase was further described in an invoice dated April 6, 1974, which was sent to Dawson by Malina [Exhibit 11] and reads as follows:

The Court concludes that this representation was without a reasonable basis in fact. In reaching its conclusion, the Court has given considerable weight to the testimony of Margaret Medley, who is recognized as one of the world's foremost experts on antique Chinese ceramics, that this vase is not a Sung Dynasty work, but rather a much later work—an opinion which was also expressed by James Lally. The Court notes that while Anthony duBoulay testified that this vase might be a Sung work, he stated that he himself believed this vase to have been made during the Ming period. Similarly, while Robert Sistrunk testified that this vase might be as early as the late Sung Dynasty, he stated that it might also be as late as the Ming Dynasty. Even though Marilyn Priem and Roger Priem testified that they believed this to be a Sung work, their testimony, when balanced against the testimony of the other experts, fails to establish a reasonable basis in fact for Malina's unequivocal and unqualified attribution of this vase to the period of the Sung Dynasty.

The Court further concludes that there was no reasonable basis in fact for the provenance attributed to this vase by Malina, i. e. that it had been exhibited at the New York Metropolitan Museum of Art in 1916 as part of the Samuel T. Peters collection. The Court notes that in his testimony at trial Malina testified that he based this representation as to the provenance of this piece on a comparison of this vase, which

had been brought to him by a "runner" in the trade, with a picture of a vase in a catalogue published by the Metropolitan Museum of Art in connection with the 1916 exhibit. Malina conceded that he made no effort to inquire whether the vase depicted in the catalogue was still in the possession of the Museum nor to ascertain whether this vase was in fact the same one which had been exhibited at the Museum in 1916. The testimony of Suzanne Valenstein, Associate Curator of the Metropolitan Museum of Art's Far Eastern Art Department, that the vase depicted in the catalogue remains in the possession of the Museum at the present date conclusively establishes that this representation was completely unfounded. For the foregoing reasons the Court finds that plaintiff has established that defendants have breached the express warranties made with respect to this vase.

## 2. The Jade Lotus Bowl

■ Malina made the following warranties with respect to this bowl (Plaintiff's Exhibit 30) in the final bill of sale:

"Antique Chinese mutton-fat jade bowl in a lotus form shape. 6½" in diameter, 3' high. Chien Lung period, 1736–1795."[7]

The Court finds that there was a reasonable basis in fact for Malina's attribution that this bowl was made during the Chien Lung period. All of the experts called by defendants concurred in the opinion that this bowl was properly ascribed to the Chien Lung period; indeed, three of these experts, du-

This vase is a modified pear shaped body, with the lower section with slightly raised lotus petals. The contracted neck and spreading mouth with raised studs, suggest the seed pod of the lotus.
The thick opalecent [sic] blue glaze, with touches of lavender, is minutely crackled, and has fine bubble marks, which give it depth. (This was missing on later copies of Chun ware)
The vase is 14¼ inches high, and 8¼ inches in diameter at the widest point.
The only repairs are the little section on the base which was glued back on, and there is a little nick on one of the lotus petals. Both were shown to you.
This vase was originally in The Samuel T. Peters collection. It was exhibited at the Metropolitan Museum of Art in New York

City in the March 1916 Exhibition of Early Chinese Pottery and Sculpture. (# 148 in the illustrated catalogue book of the exhibit)
$35,000.00

$35,000. "

7. The jade lotus bowl was further described in an invoice dated May 29, 1975 from Malina to Dawson [Exhibit 19] and which reads in pertinent part:

"Finely carved nephrite, mutton-fat jade bowl carved in a lotus form. It has a slightly scalopped [sic] top with little peaks, and the sides have spaced outward and inward curved vertical carved lines. The base of the bowl has an unusual outward curviture. It is 6½ inches in diameter, and 3 inches in height. It is of the Chien Lung period, 1736–1795."

Boulay, Sistrunk, and Frankel, expressed the opinion that this bowl might possibly be even earlier. Moreover, even plaintiff's expert, Lally, conceded that although he himself would prefer to leave this bowl undated or call it an eighteenth piece, it would be acceptable by most authorities in the field as a work of the Chien Lung period. For these reasons the Court concludes that plaintiff has not proved a breach of warranty with respect to this item.

### 3. The Jade Peach-Tree Carving

■ Malina made the following attributions in the final bill of sale to the jade peach-tree carving (Plaintiff's Exhibit 7):

> "Antique Chinese white jade carving of a tree with leaves and peaches on its branches. The openwork carving has a lacelike quality to it. 5¾″ long, 3″ high. Chien Lung period. 1736–1795." [8]

The Court finds that Malina's attribution of this peach-tree carving to the Chien Lung period was without a reasonable basis in fact. Although there was testimony from duBoulay, Sistrunk, and both Marilyn and Roger Priem that this carving exhibited characteristics of works made during the Chien Lung period, it is noteworthy that each of these experts qualified his or her opinion with regard to this piece, duBoulay stating that he thought this piece to be late Chien Lung or possibly shortly thereafter, Sistrunk stating that he himself would not guarantee that it had not been made at a later date, and Marilyn Priem stating that she would ascribe the piece as being late eighteenth century/early nineteenth century or late Chien Lung period/early Chia Ch'ing period. Indeed, Roger Priem flatly stated that he thought this carving was not made during the Chien Lung period but rather in the Chia Ch'ing period which followed. Plaintiff's expert Lally also testified that it was his belief that this carving was not a Chien Lung piece but a late nineteenth century work. Considering the expert testimony with respect to this carving as a whole, it is clear that Malina's unqualified attribution of this piece to the Chien Lung period is not supported by a reasonable basis in fact and that any attribution with respect to this carving should have been qualified at the very least as being "probably" or "possibly" Chien Lung. Accordingly, the Court concludes that defendants are liable to Dawson for breach of warranty with respect to this piece.

### 4. The Jade Lotus Vase

■ Malina warranted the jade lotus vase (Plaintiff's Exhibit 3) in the final bill of sale to have the following attributions:

> "Antique Chinese white jade vase carved in the form of several lotus flowers, with a bird perched on the edge of one of the flowers. It is 7″ high, and 5″ wide, and was made in the Chien Lung period, 1736–1795." [9]

The Court finds that there was a reasonable basis in fact for Malina's attribution that the vase was made during the Chien Lung period. The testimony of all of the experts called by defendants supports this conclusion. While two of defendants' experts, duBoulay and Sistrunk, qualified their opinion that this vase was made during the Chien Lung period by stating that it might possibly have been made after the end of

---

8. The jade carving was further described in an invoice dated March 25, 1974 from Malina to Dawson [Exhibit 2] which reads as follows:

> "Very unusual antique Chinese white jade carving of a tree with leaves and peaches on its branches . . . and the sacred fungus in one corner of the carving. This particular carving is done with fine openwork and has the feeling of fine lacework to it. It is of the Chien Lung period, 1736–1795. 5¾ inches long, 3 inches high, 1⅞ inches wide.
> $3,400. "

9. The jade lotus vase was further described in an invoice dated March 25, 1974 from Malina to Dawson [Exhibit 1] and reads in pertinent part:

> "Antique Chinese white jade vase carved in the form of several lotus flowers, with intertwined stems and leaves. A bird is perched on the edge of one of the lotus flowers. This vase is 7 inches high and 5 inches wide. It is of the Chien Lung period, 1736–1795. (it is a larger version of the 5¾ inch lotus vase illustrated in plate # 90, of Chinese Carved Jades by S. Howard Hansford, Professor Emeritus of Chinese Art and Archeology in the University of London, and former head of the Percival David Foundation)."

Chien Lung's reign, both stated that in their opinion it would nevertheless be proper to characterize this vase as a Chien Lung work. In addition, both Marilyn and Roger Priem ascribed this piece to the Chien Lung period without any qualifications, while Frankel ascribed it to the latter eighteenth century/Chien Lung period. Although plaintiff's expert Lally testified that it was his opinion that this vase was not of the Chien Lung period, but rather a late nineteenth century/twentieth century work, this testimony alone appears to be insufficient to carry plaintiff's burden of establishing by a preponderance of the evidence that Malina's attribution of this vase to the Chien Lung period was without any reasonable basis in fact. Consequently, the Court concludes that plaintiff has not established a breach of warranty with respect to this vase.

### 5. The Jade Pilgrim Vase

[10] In the final bill of sale, Mr. Malina made the following attributions to the vase (Plaintiff's Exhibit 31):

"Antique Chinese white jade covered pilgrim vase with two stylized dragon handles, each suspending a loose fing [sic]. The front panel has a naturalistic setting carved into it, and the rear panel has a

poem written on it, as well as the Chien Lung seal. It is 5¾" high and 3¼" wide, and is of the Chien Lung period, 1736–1795." [10]

Additionally, by letter dated June 12, 1974 from Malina to Dawson, Malina wrote:

"It is an Imperial Chien Lung piece (1736–1795) and has the seal in the lower left corner of the back."

Thus Malina made a two part attribution with respect to this work, the first being that the vase was made during the Chien Lung period, the second that this vase was an Imperial Chien Lung piece. The Court finds that the attribution made by Malina was without a reasonable basis in fact.

With respect to the first part of the attribution, that this vase was made during the Chien Lung period, plaintiff's expert, Lally, expressed his opinion that this vase was a copy of a larger Chien Lung pilgrim vase made at a much later date. Although defendants' experts testified that they believed this vase to have been made during the Chien Lung period, Sistrunk qualified his opinion by stating that it might possibly have been made in the Tao Kuang reign.

Although defendants' expert, duBoulay, testified that he thought it possible that

---

10. In the letter dated June 12, 1974 from Malina to Dawson [Exhibit 21], as mentioned above, Malina commented as follows with respect to this vase:

"This vase is extremely well hollowed out, and the top is very well fitted. The jade itself is 5¾ inches high, and 3¼ inches wide at the widest point. It is an Imperial Chien Lung piece (1736–1795) and has the seal in the lower left corner of the back. The Caligraphy on the back is a poem which translates:

The fair sky is enlightened by a distant sail,
The bright moon is illuminated by a pureness of the willows and clouds.
People drift away with the flowing waters but nature remains forever,
Splashing waves play harmonious songs as the water's vapor rise from the lake like puffs of smoke.

This vase is a great rarity. The price on it is $25,000, however, if you wish it, consider the price at $21,000.

.   .   .   .   .

I do strongly feel that the Pilgrim bottle is a great rarity, and should not be missed."

An invoice dated August 8, 1974 from Malina to Dawson [Exhibit 29A] reads as follows: "Antique Chinese white jade covered Pilgrim vase, with two stylized dragon handles with a loose ring suspended from each.
The front panel is carved with a naturalistic setting of a man in a boat with a sail, on water, with mountains in the background, and land areas with trees, and a building.
The back panel has a poem written in caligraphy which translates:

"The fair sky is enlightened by a distant sail,
The bright moon is illuminated by a pureness of the willows and clouds,
People drift away with the flowing waters but nature remains forever,
Splashing waves play harmonious songs as the water's vapor rise from the lake like puffs of smoke.

On the back panel is also the Chien Lung seal. The inside of the vase is very well hollowed out.
It is 5¾ inches high, and 3¼ inches wide at the widest point.
It is an Imperial Chien Lung jade carving (1736–1795)     $21,000"

this vase was an Imperial piece, before he could state categorically that it was, he would want to know more about its provenance. Sistrunk testified that while he believed the vase was *probably* an Imperial piece he conceded that this was a matter of conjecture. Defendants' other experts who expressed the opinion that the vase was an Imperial Chien Lung piece based their opinions in substantial part on the presence of the seal. In light of the testimony by both plaintiff's expert witness, Lally, and defendants' expert, duBoulay, that the Imperial seal could have been placed on the work at a later date, it appears to the Court that the attribution that the vase was an Imperial piece of the Chien Lung period, should have been qualified at least as being "probably" or "possibly" an Imperial vase of the Chien Lung period. The presence of the seal alone would not provide a reasonable basis for an unqualified attribution.

Viewing the expert testimony with respect to this item as a whole, it is clear that Malina's unqualified attribution that this was an Imperial vase of the Chien Lung period is not supported by a reasonable basis in fact. For the foregoing reasons the Court finds the defendants liable to Dawson for breach of warranty with respect to this item.

In view of the foregoing, plaintiff is entitled to rescind the purchase of the large blue ceramic vase, the jade peach-tree carving, and the jade pilgrim vase and obtain a refund of the purchase price totalling $59,400 with interest to run from the date of purchase.

*II. Plaintiff Dawson's Claim for Breach of Contract as to Freight and Insurance Costs*

At trial, Dawson testified that on the occasion of his first visit to the premises of GMI on March 25, 1974, he asked Malina if he would pay costs of freight and insurance in connection with any shipment of any items he might purchase from GMI if he did not pick them up personally, and that Malina agreed that he would do so. Dawson also testified that after he decided to have the shipment forwarded from London on to Jersey, Channel Islands to avoid the complications posed by British Customs regulations, he asked his agent in London to contact Malina to inquire whether Malina would bear the cost of insurance to cover the objects while the shipment was in London awaiting forwarding to Jersey, Channel Islands and while the shipment was in transit from London to Jersey, Channel Islands, and that he had been informed by his agents that Malina (through the latter's agent) had agreed to do so. Dawson pointed out that he himself had agreed to pay the cost of freight for shipping these items on to Jersey from London, and that this aspect of the freight charges is not an issue in his claim against defendants for breach of contract.

As previously indicated, when Dawson returned the porcelain mirror-black vase to GMI in February, 1975, Malina applied the refund of $2,500 which Dawson had paid for this item toward costs of freight and insurance incurred and paid for by GMI in connection with the shipment, $2,747, and billed Dawson for the balance of $247. Dawson contends that Malina's application of the $2,500 refund toward costs of freight and insurance incurred by GMI was a breach of what he alleges to have been an oral agreement between himself and Malina that such charges would be borne by GMI. Accordingly, Dawson seeks damages in the amount of $2,500.

Malina denies that he agreed with Dawson to pay costs of freight and insurance on this shipment. Indeed, Malina testified that he could not recall having had any discussion with Dawson concerning this matter. Malina further testified that although he initially paid the freight and insurance on shipment of the objects while they were in transit from New York to London, and the insurance while they were in storage in London, and in transit from London to Jersey, Channel Islands, he did so on the understanding that such costs were ultimately to be billed to Dawson and paid

for by him. Malina testified that he had advanced the money to pay for these charges on Dawson's behalf because he did not want to create any problems for Dawson, Malina stating that he knew Dawson to be concerned with his father's illness at that time.

■ An oral agreement is enforceable under New York law and not within the Statute of Frauds, N.Y.Gen.Obl.Law § 5–701 (McKinney 1964), if it can be construed as being capable of performance within one year of its making. *North Shore Bottling Co. v. C. Schmidt & Sons, Inc.,* 22 N.Y.2d 171, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968). Since the oral agreement alleged by Dawson was clearly capable of performance within one year of its making, the Statute of Frauds does not pose any problem to its enforcement.

■ Consequently, the only question presented here is one of fact—whether there was such an agreement between Dawson and Malina, as Dawson contends. On the basis of the evidence at trial with respect to this issue, the Court concludes that there was an agreement between Dawson and Malina that Malina would pay costs of freight in shipping the objects from New York to London and the cost of insurance on these objects while they were in transit from New York to London, while they were in storage in London, and while they were in transit from London to Jersey, Channel Islands. In making this determination the Court is persuaded by Malina's actions consistent with the oral agreement alleged by Dawson, in initially paying for these charges. In addition, the Court relies on a portion of a letter dated October 1, 1974 from Malina to Dawson which reads in pertinent part:

"Do not be disturbed by the changing of dates, or anything else concerning the shipment. I have arranged to have the insurance on the shipment extended (I believe it is originally for 15 days). My whole concern is that you will receive it safely in London, when you arrive, and with no problems to you (that is why I am having someone clear the shipment through customs as well). *All charges are being taken care of, and you should not have any thing to take care of."* (Emphasis added.)

The Court finds that due to the oral agreement, Malina was responsible to Dawson for the charges for freight and insurance. Accordingly, Dawson is entitled to the $2,500 refund on the porcelain mirror-black vase, which refund Malina used to cover such charges. Based on this conclusion, the Court rules that Dawson is entitled to damages in the amount of $2,500 on this claim with interest to run from November 25, 1974, the day Dawson returned the porcelain mirror-black vase to Malina.

*III. Plaintiff Dawson's Claim to Pierce the Corporate Veil of GMI*

■ The testimony of Malina and documentary evidence establish that GMI was merely the name used for the gallery. Although GMI was incorporated in 1954, there have been neither corporate minutes kept nor meetings for the Board of Directors held since the date of incorporation. In response to the Court's request for GMI's franchise tax reports, GMI has submitted only one New York State corporate franchise tax report for the period of August 1, 1975 until July 31, 1976. No evidence was offered to indicate that Malina observed corporate formalities in operating the gallery. Under these circumstances, Malina must be held individually liable for the amount found to be due to plaintiff. *Berkey v. Third Avenue Railway,* 244 N.Y. 84, 155 N.E. 58 (1926); and *Majestic Factors Corp. v. Latino,* 15 Misc.2d 329, 184 N.Y. S.2d 658, 659–60 (Sup.Ct., N.Y.Co.), *appeal dismissed,* 8 A.D.2d 594, 187 N.Y.S.2d 1017 (1st Dept.1959) (mem.).

Plaintiff is entitled to rescind the purchase of the large blue ceramic vase, the jade peach-tree carving, and the jade pilgrim vase and to obtain a refund from GMI or Malina of their purchase price totalling $59,400 with interest to run from the date of purchase. Plaintiff is also entitled to recover damages of $2,500 with interest to run from November 25, 1974 from GMI or

Malina by reason of Malina's breach of contract with respect to the insurance and freight charges.

The foregoing constitutes the Court's findings of fact and conclusions of law. Rule 52(a) Fed.R.Civ.P.

Settle judgment on notice.