**Edward M. BALOG and Helen L. Balog, Plaintiffs,**

v.

**CENTER ART GALLERY–HAWAII, INC. dba Center Art Gallery, William D. Mett, Marvin L. Wiseman and Lloyd Wright, Defendants.**

**Civ. No. 89–00033 ACK.**

United States District Court, D. Hawaii.

Aug. 21, 1990.

Jeffrey S. Portnoy, Patricia J. McHenry, Cades Schutte Fleming & Wright, Honolulu, Hawaii, for plaintiffs.

Peter C. Wolff, Jr., Hart & Wolff, Honolulu, Hawaii, for defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

PENCE, Senior District Judge.

This matter came before the court on a motion brought by the defendants in this action for a judgment based on the pleadings alone. The defendants contend that an application of the U.C.C.'s statute of limitations bars the plaintiffs' action and that this court should therefore dismiss the case. This court finds the application of the statute urged by the defendants to be inappropriate and accordingly with this order denies the defendants' motion.

I. *Factual Background*

The plaintiffs in this action are residents of the State of Washington. The defendants are all residents of the State of Hawaii.[1] In November of 1978, while the plaintiffs were tourists in Hawaii, they visited one of the defendants' art galleries. Center Art offered the plaintiffs a number of works of art, and over the course of time solicited the plaintiffs via telephone calls and through the mail to purchase various pieces of artwork, all purportedly produced by Salvidor Dali.

Beginning in 1978, the plaintiffs purchased a number of pieces over a period of four years, all of which were purportedly produced by Dali.[2] These were represented by Center Art to be of equal or greater worth than the purchase price; the plaintiffs paid a total of $36,200 for the artwork.

After the sale, Center Art continued to mail to the plaintiffs a "Confidential Appraisal—Certificate of Authenticity" for each of the artworks they had purchased. They received such mailings in 1979, 1980, 1981, 1982 and in 1987. In each of these mailings, the defendants continued to maintain that the artworks were produced by Dali either as exclusive originals or as limited editions; furthermore, they represented to the plaintiffs that the artwork had appreciated in value above the price originally paid for it, setting forth the increased value for each piece in each mailing. The plaintiffs, who were private collectors but who claim to have no special expertise re-

---

1. Since general jurisdictional issues were not disputed, this court will not raise them *sua sponte.* The court notes, however, that where a party pleads for judgment on the pleadings, jurisdictional questions can sometimes prove dispositive, particularly where, as here, value of the artwork purchased is less than the federally-mandated $50,000 limit for diversity jurisdiction.

2. The plaintiffs ultimately purchased a suite of four prints entitled "Retrospective Suite" which were represented to be original lithographs hand-signed by Dali; a wall sculpture entitled "Christ St. John of the Cross" which was represented to be an original wall sculpture by Dali; a set of three prints entitled "Les Amoureux" represented to be original lithographs hand-signed by Dali; a wall sculpture entitled "The Last Supper", represented to be a limited edition original wall sculpture by Dali; a wall sculpture entitled "Lincoln in Dalivision" which was represented to be an original wall sculpture by Dali; a print and a wall sculpture collectively entitled "Three Graces of Hawaii" represented to be an original lithograph hand-signed by Dali and a limited edition original wall sculpture by Dali; and two prints entitled "Christ of Gala" represented to be original lithographs hand-signed by Dali. The purchases were made over a period of time which ranged from November 1978 to April 1981.

garding the authenticity of the artwork in their collection, relied on the representations of the defendants including the "Certificates of Authenticity" which the defendants repeatedly sent to them. In 1988, the Balogs first became aware of newspaper articles and television reports which indicated that representations made by the defendants relative to artwork sold through their gallery might be false. According to the plaintiffs, they had been unaware of the existence of allegations of such conduct which were made against the defendants as early as 1980 and reported in the local press.[3] The plaintiffs investigated these allegations and ultimately filed their complaint in this action on January 13, 1989.

## II. *The Present Motion*

The defendants have moved for a dismissal of the case on the grounds that the complaint was not filed within the applicable statute of limitations which they maintain is 4 years from the time the cause of action accrued under H.R.S. § 490:2-725(1); UCC Art. 2-725(1). Since the artwork was all sold to them by 1981 and the plaintiffs did not file their action until 1989, almost 7½ years later, the defendants contend that no cause of action may be maintained. The plaintiffs response is that the statutes of limitation for the causes of action alleged in the complaint are all tolled by the defendants' continued action which the plaintiffs contend amounted to fraudulent concealment. The plaintiffs argue that they are thereby relieved from any statute of limitations until the time that they knew or should have known about the causes of action.

## III. *Discussion*

As set forth above, this case deals with allegedly counterfeit artwork which was sold to the plaintiffs based on the defendants' representations that it was genuine. The plaintiffs have claimed that, among other things, they have a cause of action for breach of an express warranty under the Uniform Commerical Code since by selling them fake artwork, the defendants breached the express warranties which are outlined in the Code; they claim that the defendants are therefore liable for the damage caused the plaintiffs through the defendants' sale of non-conforming goods. The defendants contend that no warranties were made explicitly and that the plaintiffs had an obligation to discover the non-conformity and bring any claim based on the allegations of forgery long before now. As the claims of counterfeiting and the various methods of detection and discovery of forgery are so intermingled with the legal arguments made by the parties, this court will first review the factual background which attends such claims.

## A. Methods of Counterfeiting and Detection

This court has looked at various methods of counterfeiting art as a means of providing a background against which the application of the Uniform Commercial Code can be assessed. In order to assess the appropriateness and effectiveness of Article 2 as a means of affording buyers protection against fraud and misrepresentation by dealers, auction-houses and even artists themselves, it is necessary to provide a brief overview of the basic problems involved in art counterfeiting and its detection.[4]

### *Art Forgery and Its Detection*

The last two decades have seen a skyrocketing market in the art world. Sales prices in the tens of millions of dollars for single works of art, once staggering, no longer cause much more than a ripple

---

**3.** Stories written in the *Honolulu Advertiser* in July of 1980 listed customer complaints against the galleries which went back to 1975 and stated that the Attorney General's office had filed a complaint against the gallery for abuses, particularly related to the sale of "superstar art" by such artists as Salvidor Dali.

**4.** The court is of the view that it is of minimal value for a party to point to a potential remedy available to a buyer if in fact that remedy is either ineffectual due to its imprecision, or so costly as to not be a viable option for the collector to employ. It is for this reason that the court has gone into the background of art forgery and its detection.

among those familiar with the market.[5] These types of sales figures have presented both forgers and unscrupulous dealers with unprecedented opportunities for swindling the art-buying public. It has been estimated that transactions involving forgeries may comprise up to ten percent of the total art sales made annually.[6]

While this is a civil case, the defendants have already been criminally convicted of mail and wire fraud for conduct similar to that alleged by the plaintiffs. *United States v. Center Art Gallery, Inc. dba Center Art Gallery, William D. Mett, Marvin Wiseman*, CR. No. 89–00125 HMF, Judgment entered on May 4, 1990. Notwithstanding the convictions which have occurred in this case, in many other instances, the criminal law has often proven an ineffective weapon in pursuing forgers and counterfeiters.[7] Furthermore, the problem of increased incentives for forgery and counterfeiting is often compounded by the fact that forgery victims are reluctant to cooperate with prosecutors in going after forgers and counterfeiters. Defrauded dealers may fear loss of reputation and prefer silence to the risk of lost business; purchasers often fear public embarrassment at having been made a dupe. Additionally, there is the incentive to preserve the value of the counterfeit item for resale or tax purposes, even at the cost of abetting a known forger.[8]

### 1. *Methods of Art Forgery* [9]

There are numerous ways in which an artwork can be counterfeited. The court reviews them briefly simply to provide a background against which the defendants' arguments may be assessed.

#### a. Faked Signatures

This method consists of adding a recognized artist's signature to a painting or other work not executed by that artist. A signature is widely considered a valuable indicator of originality, but due to the fact that the number of unsigned paintings, especially those of classical periods, exceeds the number of signed ones, this practice is especially popular. When a signature is fixed with varnish it grows to looks more authentic with the passage of time.

#### b. Completing Unfinished Canvases

More complicated than adding a signature is for the counterfeiter to complete an unfinished or discarded canvas of the original artist. Many such canvases are currently available in the market, and are particularly attractive as mediums of forgery due to the fact that the canvas itself possesses the correct age of the period, and the older, authentic portions of the work may belie the forger's additions.

#### c. Misrepresentation

A dealer or collector may sell a painting done by a member of a master's school, or a painting of the "period" during which a significant artist painted as if it were a work by the artist himself. It is not uncommon for students of a particular artist to have been so influenced by their master's technique that simple alterations and

**5.** Though there is no reliable source for annual figures, sales in the U.S. art market have been estimated to be at least $400 to $500 million dollars annually. Sales of single collections can yield gross sales of $40 million or more. *See* Lyne, *Art Law Blooms*, The National Law Journal, June 18, 1990, at 36, col 2.

**6.** DuBoff, *Controlling the Artful Con: Authentication and Regulation*, 27 Hastings L.J. 973 (1976).

**7.** For problems inherent in the criminal prosecution of purveyors of counterfeit art, *See* DuBoff, *Controlling the Artful Con: Authentication and Regulation*, cited *supra*, at pp. 998–1002; Note, *Legal Control of Fabrication and Market-* *ing of Fake Paintings*, 24 Stanford L.Rev. 930, 940–941 (1972).

**8.** In instances such as this, not only is the purchaser defrauded, but the Treasury becomes a victim as well through the loss of revenue in the form of deductions for charitable gifts of inauthentic artwork or the duty-free importation of supposedly original artwork under 19 U.S.C. § 1202, Schedule 7, Part 11.

**9.** This summary of art forgery techniques was taken from an extended review of the subject and the legal regulation in the field. Note, *Legal Control of the Fabrication and Marketing of Fake Paintings*, 24 Stanford L.Rev. 930, 932–934 (1972).

touch-ups are sufficient to disguise a work and render it a plausible product of the hand of the artist himself.

### d. Reproduction

Using this method, the counterfeiter creates a copy of the specific piece and then sells it as a genuine original. The practice is not uncommon as a means of teaching students and improving their own technique. Hence copies have been made of significant pieces of art of every period; although many are produced for the pleasure or training of the copyist, others are created to be passed off as genuine originals.

### e. Pastiche

This is a complex form of fabrication whereby the forger excises a number of details of various different paintings of the same artist and then reassembles them into a new work. In order to be successful, the counterfeiter must be so intimate with the technique of the master as to enable him to select those details which may be refabricated into a pastiche that closely resembles the master's style. When done effectively, such counterfeits are extremely difficult to detect.

### f. Drawings

Drawings are faked frequently—unfinished sketches, outlines and working sketches of works which were completed later. Because drawings contain fewer details than the finished product, the counterfeiter may find them easier to produce and to pass off as originals. There are even techniques whereby paper can be artificially aged so as to simulate that which was used during the drawing's purported era.

### 2. *Methods of Detection*

There are primarily two methods of detecting art forgeries. The first requires that an expert employ the use of accumulated experience with and knowledge of the technique and work of a particular artist to come to a judgment as to whether the object or painting is what it professes to be. This involves the application of intuition and expertise.

The second method is to employ the growing number of scientific tests and laboratory processes available to detect a suspected forgery. These can range from the fairly straightforward application of ultraviolet or infrared light as a means of revealing the substructure of a painting to the use of radiocarbon dating, x-ray diffraction, thermoluminescence, obsidian hydration, examination of fission tracks, and other microscopic techniques.[10]

The application of either method requires a substantial investment of capital, and as a practical matter, the cost of authenticating a work of art may be prohibitive when the item is not one of considerable value.

### B. Protection Available to the Buyer—the U.C.C.

Obviously a buyer's incentive to employ the various techniques available to authenticate a work is a function of the purported value of the potential investment the buyer is contemplating. Such is the case here. The total consideration given for all of the works of art at issue in this case was only $36,000 for some seven different pieces. While this is not an inconsequential sum to many a private collector, it hardly rises to the level that would justify the expenditure necessary to have all or each of the works involved in this case authenticated. However, an institution considering spending tens of millions of dollars for a single painting may find it prudent to part with a large sum of money as a means of obtaining some type of guarantee or warranty of the work's authenticity. Furthermore, there are many responsible dealers in the market who will issue guarantees on the works they sell and rescind transactions involving works whose originality is in question. But in these situations, it is the buyer who has the burden of discovering the fake, which is by no means an easy or inexpensive task.

---

**10.** For a detailed explication of scientific techniques currently employed, *see,* Duboff, *Control-* *ling the Artful Con: Authentication and Regulation, cited supra,* at pp. 987–997.

Moreover, small private collectors such as the plaintiffs often do not have such options at their disposal. They are normally without the technical expertise necessary to conduct scientific examination, nor do they possess sufficient familiarity, knowledge or experience to judge for themselves as an expert whether a work is what its seller professes it to be. And even with the battery of methods of detection available today, some well-executed fakes have fooled even knowledgeable buyers and dealers. However, the average buyer will take little comfort in the fact that in having been duped he has joined elite company. What the defrauded party wants is redress of his or her damages.

Apart from New York and Michigan,[11] the states have made no attempt to provide buyers of art with specific legislative protection from art forgery.[12] As the defendants are intimately aware in this case, the federal government has in place criminal fraud statutes, but has not implemented a scheme which would provide for civil damages for wrongs of this type. Therefore,

outside of New York and Michigan, plaintiffs who wish to pursue damage claims for being sold counterfeit or forged artwork must pursue their damages under the common law,[13] general fraud provisions, if any, or the Uniform Commercial Code as it has been enacted in that jurisdiction. As the issue in this case is focused under the U.C.C., this court now turns to a consideration of that statute.

## C. The Warranty Provisions of the U.C.C. as a Means of Buyer Protection

■ The Uniform Commercial Code embodies an integrated framework for the regulation of the sale of goods. Under the definitions provided in Article 2 of the Code, paintings, prints and sculpture such as those purchased by the plaintiffs in this case would fall within the Code's definition of goods. U.C.C. 2–105.[14]

The few reported cases which have dealt with the U.C.C.'s application to the sale of artwork will be dealt with in detail *infra*. However, the court notes here that there

---

**11.** In 1966, New York passed the Arts and Cultural Affairs Law as a supplement to the U.C.C. N.Y. Arts & Cult.Afl.Law §§ 11.01–15.21 (McKinney 1984 & Supp.1988). Subsequently, Michigan enacted a statute similar to the New York law. Mich.Comp.Laws Ann. §§ 442.321 et seq. (West Supp.1987). A similar statute was proposed for Illinois but never enacted. However, California, Illinois, Maryland, and Hawaii have enacted special legislation to protect purchasers of fine art multiples. Cal.Civ.Code §§ 1740–1745.5 (West 1985); Ill.Rev.Stat. ch. 121½, §§ 361–69; Ann.Code of Maryland, Commercial Law § 14–501 et seq.; Hawaii Rev.Stat. §§ 481F–1—481F–9. For an analysis of the application of the New York and Michigan statute, *see* Gerstenblith, *Picture Imperfect: Attempted Regulation of the Art Market,* 29 William and Mary Law Review 501, 507–523 (1988).

**12.** Numerous other solutions to the problem of counterfeit art have been proposed. One author had the idea that each artist should place on each canvas, board or sculpture a signature or distinctive design followed by a number or special impression having a particular high atomic weight which could be viewed by the use of x-ray or ultraviolet light. Hodes, *Truth in Art,* The Justian L.J. 13 (1966). An interesting sidelight in relation to this proposal is the case of Toulouse–Lautrec, who tried to prevent forgeries by secretly adding a small symbol to his works. However, since he kept the symbol a

secret, many expert examiners have been unable to refer to it. S. Schuller, *Fogers, Dealers, Experts,* (1959), p. 183. Another proposal has been the establishment of a federal art archive under the supervision of the Smithsonian Institution which would issue certificates of authenticity upon which buyers names would be recorded, similar to a Torrens title system. *See,* Note, *Legal Control of the Fabrication and Marketing of Fake Paintings, cited supra,* at pp. 938–939.

Copyright laws have minimal application to works which remain out of the public domain. For works in the public domain, protection is for 28 years, plus a similar period upon renewal. 17 U.S.C. §§ 1–2, 5, 24–25. But for works which either predate or are outside the protection of copyright law, or for which the copyright has expired, protection is minimal.

**13.** For a review of the common-law remedies available in both England and the U.S., *see* Gerstenblith, *supra,* at pp. 504–507.

**14.** Hawaii Rev.Stat. § 490:1–101 et seq. is the State of Hawaii's version of the Uniform Commercial Code. Haw.Rev.Stat. § 490:2–105(1) defines "goods" as: "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities ... and things in action...."

has been considerable scholarly disagreement regarding the adequacy of the protection afforded the purchaser of artwork by the U.C.C.[15]

 Presumably, the Code would protect purchasers of counterfeit artworks, such as the plaintiffs, by means of the express warranty provisions of U.C.C. § 2–313.[16] H.R.S. § 490:2–313, Hawaii's version of § 2–313, reads as follows:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Haw.Rev.Stat. 490:2–313 (1988).

 The foundation of every express warranty provision is the core description. *See* U.C.C. § 2–313, Comments 1 and 4. "A 1990 Toyota," "a pair of shoes," or "a Monet" are all examples of core descriptions. The core description, at base, pro-

---

**15.** *See* Gerstenblith, *supra,* at pp. 507–529; F. Feldman and S. Weil, *Art Law: Right and Liabilities of Creators & Collectors,* 4–6 (1986); DuBoff, *supra,* at pp. 1102–1166; Comment, *Current Practices and Problems in Combatting Illegality in the Art Market,* 12 Seton Hall L.Rev. 506 (1982); Note, *The Uniform Commercial Code Warranty Provisions and the Theory of Strict Liability in Tort as Solutions to Art Counterfeiting in Painting: A Critical Analysis,* 20 St. Louis University L.Rev. 531 (1976); Note, *Uniform Commercial Code Warranty Solutions to Art Fraud and Forgery,* 14 William and Mary L.Rev. 409 (1972).

**16.** The court recognizes that in addition to § 2–313's express warranty, the Code provides for implied warranties under § 2–314 and § 2–315.

§ 2–314 states that unless it is excluded or modified in accordance with § 2–316, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." (Clearly the defendants here would be considered 'merchants'.)

To be merchantable, the goods must be reasonably suitable for the ordinary purpose for which they are to be used. § 2–314(2). Therefore, in order to establish a cause of action under § 2–314, a buyer claiming that he had been sold counterfeit artwork would be required to show that the artwork was not 'merchantable' due to the fact of its being counterfeit. Notwithstanding investment value or the buyer's personal desire to own an original, the ordinary purpose to which artwork is put is to be displayed for its aesthetic appeal. And with respect to this ordinary use, a counterfeit will have satisfied that purpose equally with an original. For this reason, in the view of this court, the implied warranty of merchantability would not be applicable to cases such as the instant case.

§ 2–315 provides that if a seller has reason to know of any particular purpose for which the goods are to be used, and that if the buyer has relied on the seller's skill or judgment to furnish suitable goods for the buyer's purpose, then an implied warranty that the goods shall be fit for such a purpose arises. However, Comment 2 to § 2–315 states that "a 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question."

With this comment as a guide, it would appear that neither a museum nor a private collector could invoke § 2–315's implied warranty for its protection, since the use of artwork for display or investment are customary uses for such items, or else are those which would not be particular to the purchaser's business. Since every piece of artwork is unique, it is difficult to envision a "particular use" which would be different from the "ordinary purpose" for which the work would be created.

For these reasons, this court will eschew the potential protection afforded by these sections and concentrate on § 2–313's express warranty protections.

vides a reference point for the level of performance to which the seller's performance must conform. And, because it is assumed under the Code that the object of every sale regulated by the Code is describable, the core description is non-disclaimable by a seller, being the basic foundation upon which every sales contract is made. *Cf., Bill Spreen Toyota, Inc. v. Jenquin,* 163 Ga.App. 855, 294 S.E.2d 533 (App.1983) (disclaimer of warranties ineffective to prevent action for fraud when car purchased was not a Toyota as expressly warranted, but was one-half of such a car welded to one-half of another unidentified vehicle).

■■■ However, the coverage of the express warranty is limited to the extent that statements used by the seller in describing his products become the "basis of the bargain." [17] Using this definition, it is clear that the defendants offered an express warranty to the plaintiffs, as that term is contemplated under H.R.S. 490:2–313, that all pieces of art sold to them were Dali originals.

■■■ However, the fact that a warranty was offered does not end the matter, since § 2–313(2) provides that "any affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." This subsection appears to be at odds with Comment 8, *cited supra,* in footnote 17, that affirmations of value or the seller's opinion become

"part of the basis of the bargain" unless good reason can be shown to the contrary.

The sale of artwork presents a unique area for the application of these two statements, since a dealer's statement that a work is the product of a particular artist can never be more than an educated guess or opinion (excluding, of course, the possibility that the dealer was an eyewitness to the work's production.)

This problem is not one which was created solely by the drafting and adoption of the U.C.C. In fact, it was the dispositive issue in the case of *Jendwine v. Slade,* decided almost 200 years ago. 170 Eng. Rep. 459 (Nisi Prius 1797). In deciding whether or not the act of putting the name of an artist in a catalogue as the painter of a picture created a warranty as to the painting's authorship, Lord Kenyon stated that:

> [I]t was impossible to make this the case of a warranty; the pictures were the work of artists some centuries back, and there being no way of tracing the picture itself, it could only be a matter of opinion whether the picture in question was the work of the artist whose name it bore or not.

*Id.*

However, Lord Kenyon's opinion does not come down to this court as the only authority on the issue. The case of *Power v. Barham,* 111 Eng.Rep. 865 (K.B. 1836) is more factually allayed with the case at bar in that the court in that case had before it parties who were disputing over represen-

---

17. This court notes the possibility of disagreement about whether the requirement that statements become part of the basis of the bargain eliminates the reliance requirement which was part of pre-Code law, *cf.,* Note, *The Uniform Commercial Code Warranty Provisions and the Theory of Strict Liability in Tort as Solutions to Art Counterfeiting in Painting: A Critical Analysis, supra,* at pp. 538–540; *contra,* DuBoff, *supra,* at pp. 1005–07. However, this court finds Comment 1 to § 2–313 to be the most applicable authority to the set of facts presented by the instant case, holding that express warranties "rest on the 'dickered' aspects of the individual bargain' ". While this court concedes that sophisticated buyers, such as museums and major collectors, who have relatively equal access to information and an equal bargaining position with the sellers of art work might be unable to

establish the necessary reliance on the seller's representations to claim protection under an express warranty, such is not the case with the plaintiffs in the case before the court. The plaintiffs, for all intents and purposes, relied *solely* on the representations of the defendants in making their decision. Indeed, given the value of the artwork involved, and the relative degree of sophistication of the two parties, the plaintiffs could do little else. This court views the plaintiffs as having placed sufficient reliance on the defendants' representations as to have established that those representations of genuineness formed part of the "basis of the bargain." *Cf.,* U.C.C. § 2–313, Comment 8 ("all statements of the seller [become part of the basis of the bargain] unless good reason is shown to the contrary").

tations concerning a set of paintings by the artist Canaletto, a relatively "modern" painter at the time of the decision. Distinguishing the *Jendwine* case, the court in *Power* held that as Canaletto was a relatively modern painter, the authenticity of his works was ascertainable and that therefore statements regarding the authorship of his works could in fact create a warranty by attribution which could be relied upon.

Two modern cases have also dealt with the issue. The first is *Weisz v. Parke–Bernet Galleries, Inc.*, 67 Misc.2d 1077, 325 N.Y.S.2d 576 (N.Y.Civ.Ct.1972), *rev'd*, 77 Misc.2d 80, 351 N.Y.S.2d 911 (N.Y.App. Term 1974), which construed the application of the New York Sales Act, N.Y.Pers. Prop.Law §§ 82–158. In *Weisz*, the plaintiffs had purchased paintings in 1961 and 1964 which were listed in the defendant's catalog as works of Raoul Dufy. Several years later, the plaintiffs learned that the paintings were fakes. The plaintiffs sued the gallery on the grounds that the listing in the catalog constituted an express warranty. Parke–Bernet defended on the basis that the conditions of sale in the catalog included a disclaimer of warranty as to genuineness and authorship.

The trial court held that one of the plaintiffs, Mr. Weisz, had possessed no knowledge of the disclaimer and that he could not be charged legally with such knowledge. By contrast, the other plaintiff, a Mrs. Schwartz, was found to have possessed actual knowledge of the disclaimer, but the disclaimer was held to be ineffective because the defendant had intended the plaintiffs to rely on its superior knowledge and experience and the catalog had been designed to encourage such reliance and belief in the works' authenticity. *Weisz*, 325 N.Y.S.2d at 581. The court stated that it was trying to act "consistently with a whole body of law that reflects an increasing sensitivity to the requirements of fair dealing where there is a relationship between parties in which there is a basic inequality of knowledge, expertness, or economic power." 325 N.Y.S.2d at 582.

The appellate court reversed this decision based on the fact that neither the common law, nor the statute in effect at that time, recognized that the stated opinion of the seller could give rise to an express warranty and the fact that the gallery had unequivocally disclaimed any warranty. The court held that in such instances the buyer assumed the risk that the identifications might be wrong.

Obviously the facts in the case now before this court are somewhat different than those in *Weisz*. And in this court's opinion, those differences make the lower court's opinion the more applicable reasoning. There is no basis for this court to conclude, based on the papers now before it, that the defendants made any attempt to disclaim their opinion that the works in question were the products of Salvidor Dali. Furthermore, this court is of the view that not only did the plaintiffs engage in justifiable reliance upon the defendants' expertise and superior knowledge, but that the defendants encouraged such reliance and belief in the authenticity of the artwork by continuing to solicit additional sales from the plaintiffs and by continuing to send them Certificates of Authenticity and representing that their original investments had increased in value. In the face of such facts, this court is lead to agree with the trial court in *Weisz* that "the requirements of fair dealing where there is a relationship between parties in which there is a basic inequality of knowledge, expertness, or economic power" will provide a basis for the plaintiffs to seek redress of damages based on a violation of the express warranties provided for by § 2–313.

■ The second modern case which has dealt explicitly with the issue is *Dawson v. G. Malina, Inc.*, 463 F.Supp. 461 (S.D.N.Y. 1978). In this case an art collector sued a dealer for rescission or for damages under a breach of warranty claim in connection with the purchase of eleven objects of Chinese art. After the items had been shipped to the plaintiff, he began to experience doubts as to the authenticity of a vase which the defendant had attributed to the Sung Dynasty and for which the plaintiff

had paid $35,000.[18] The defendant refused to refund the purchase price and the plaintiff arranged for the appraisal of the remaining objects.

The court, citing the vagueness of the expert opinion presented at trial, along with the lack of precedent under the applicable state law (including the U.C.C.), or common law of fraud and misrepresentation, fashioned a standard of proof which inquired whether the representations made by the defendant "had a reasonable basis in fact, at the time these representations were made, with the question of whether there was a reasonable basis in fact being measured by the expert testimony provided at trial." 463 F.Supp. at 467. Using this standard, the court held that the defendant's failure to have undertaken sufficient investigation in substantiating the provenance of the items in question would allow for rescission of the transaction with a refund of the purchase price plus interest. *Id.* at 471.

This court would view this standard as an appropriate one to be applied in the instant case. As was the case in *Dawson*, the defendants here are alleged to have made very strong claims with respect to the artwork sold to the plaintiffs, and to have reiterated those statements repeatedly with the intent that the plaintiffs rely upon the defendants' representations. Furthermore, given the price of the various items sold, it is clear that the plaintiffs would have been reasonable in relying upon the defendants representations as their primary, if not sole basis for information regarding the authenticity of the pieces. As outlined *supra*, the plaintiffs were effectively precluded by the price of the pieces from undertaking an extensive investigation into the veracity of the defendants' claims that the artwork was genuine. Thus, the argument for the imposition of the "reasonable basis in fact" test has even more strength when applied to the facts of this case. Where parties are in such a discrepancy as far as information, the capacity to verify that information and bargaining position, fairness dictates that representations offered by one party with the expectation that they be relied upon by another have some reasonable basis in fact. Such is the requirement of § 2–313; therefore, to the extent that the evidence indicates that such representations do not possess a reasonable basis in fact, at the time these representations were made, this court finds that the party offering those representations will have violated the express warranties provided for under H.R.S. § 490:2–313.

**D. The Statute of Limitations Under the U.C.C.**

■ Even if the plaintiffs were ultimately able to prove that they possessed a claim for violation of the express warranties of § 2–313, the question remains whether or not the plaintiffs have brought their claim in a timely fashion.[19] "The period of limitation for causes of action

---

18. The plaintiff paid a total of $105,400 for all eleven pieces.

19. The defendants have also argued that the plaintiffs' claims for fraud and RICO are time-barred based on the application of H.R.S. § 657–1 which states that "personal actions of any nature whatsoever not specifically covered by the laws of the State" must be commenced "within six years next after the cause of action accrued, and not after." This statute provides the relevant statute of limitations for actions based on alleged fraudulent representations and negligent representations. *Au v. Au,* 63 Haw. 263, 626 P.2d 173 (1981). However, in this district, "claims for fraud, whether based on state or federal law, arise when the fraud is or should have been discovered." *First Interstate Bank of Hawaii v. Hartley,* 681 F.Supp. 1457, 1460 (D.Hawaii 1988). As to the RICO claim, while the limitations period for civil RICO is normally four years, *Agency Holding Corp v. Malley–Duff and Associates,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), in the Ninth Circuit, a civil RICO cause of action accrues when the plaintiff knew or should have known of the injury upon which his action is based. *Beneficial Standard Life Insurance Co. v. Madariaga,* 851 F.2d 271, 274–75 (9th Cir.1988). As both the fraud and RICO claims have limitations periods which run based on the "discovery rule" discussed *infra,* this court has not gone into detail regarding these two arguments, but has focused its discussion on the U.C.C. claims. The law is sufficiently clear that the "discovery rule" with respect to fraud and RICO would effectively toll the statute of limitations, thereby defeating the defendants' arguments that the actions are time-barred.

based upon the breach of express or implied warranties is governed by the Uniform Commercial Code." *Holdridge v. Heyer–Schulte Corp.*, 440 F.Supp. 1088, 1100 (N.D.N.Y.1977). H.R.S. § 490:2–725(2), the relevant statutory section, states that:

> [A] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made [except where the warranty] explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance.

Haw.Rev.Statutes § 490:2–725(2). However, this section goes on further to provide that:

> This section does not alter the law on tolling of the statute of limitations....

Haw.Rev.Statutes § 490:2–725(4).

In the majority of instances involving the application of this section to goods bought and sold under normal commercial practice, its application would be fairly straightforward. Nevertheless, complications with the rule's application arise in those instances where there is a question regarding the timing or accrual of the cause of action.

§ 2–725(2) provides that the "cause of action accrues when the breach occurs." Breach usually occurs upon tender of delivery, due to the fact that the condition of the goods at the time of delivery is central to the question of their acceptance, fitness, and conformity to contract. Unfortunately, not all breaches are apparent, or even discoverable at the time of delivery. *Cf., Spring Mills, Inc. v. Caroline Underwear Co.*, 87 A.D.2d 524, 448 N.Y.S.2d 10, 11 (N.Y.App.Div.1982) (where supplier had contracted to provide textiles treated with a chemical which was banned during the period covered by the contract, question was whether breach occurred at the time of delivery or at the time the chemical was banned).

Additionally, there are instances, such as the instant case, where one of the parties has taken steps which served to prevent the discovery of the breach by the recipient of the goods. These cases of "fraudulent concealment" will be dealt with in detail below. Suffice it to say that in those cases where the breach is not immediately apparent, or has been concealed through affirmative conduct on the part of one of the parties to the agreement, litigants have urged the use of the "discovery rule," under which the limitations period does not begin to run until a buyer could discover the breach. However, this argument has not always met with success. *See, e.g., H. Hirschfield Sons, Co. v. Colt Indus. Operating Corp.*, 107 Mich.App. 720, 309 N.W.2d 714, 716–717 (1981) (court rejects discovery rule under the U.C.C. absent a specific warranty of future performance although it adopts the discovery rule under other state law); *Coody v. A.H. Robins Co.*, 696 S.W.2d 154, 156 (Tex.Ct.App.1985) (discovery rule inapplicable since it commonly refers to the point at which the breach was reasonably discoverable, not necessarily the time of actual discovery by the plaintiff).

The plaintiffs have raised a similar argument in this case. However, the defendants assert that the plaintiffs' claims by their nature fall under the statute of limitations provided by § 2–725, since their cause of action accrued upon tender of delivery, due to the fact that the artwork was not authentic and was thus overvalued (according to the plaintiffs' allegations.) Since the breach could have been discovered by the plaintiffs at any time, the defendants maintain that there is no way the plaintiffs could claim that their cause of action fell into the "future performance" exception.

The defendants point to three cases out of the First, Second and Third Circuits wherein purchasers of artwork who belatedly discovered that the items they had purchased were frauds were time-barred from pursuing their claims against the galleries which sold them the artwork. In *Wilson v. Hammer Holdings, Inc.*, 850 F.2d 3 (1st Cir.1988), a painting was purchased in 1961 and guaranteed as genuine by the gallery which sold it. The plaintiffs discovered in 1984 that the painting was a fake and sued in 1987; the First Circuit

held that § 2–725 would provide the applicable statute of limitations and bar the claim since the plaintiffs were just as capable of discovering that the painting was a fake at the time they bought it as they were later on. The same result was reached in *Rosen v. Spanierman*, 894 F.2d 28 (2d Cir.1990) where the plaintiffs purchased a painting in 1968 and then discovered in 1987 that it was a fake and filed suit. The Second Circuit applied the same 4–year statute of limitations and held that the warranty did not extend to future performance and that the plaintiffs could have discovered the breach just as easily immediately after the sale as later. Finally, in *Firestone & Parson, Inc. v. Union League of Philadelphia*, 672 F.Supp. 819 (E.D.Pa.), *aff'd*, 833 F.2d 304 (3rd Cir.1987), the defendant sold a painting to the plaintiffs in 1981 which was allegedly produced by a renowned artist and worth $500,000. In 1985–86 it was discovered that another artist had done the painting and it was only worth $50,000. When plaintiffs filed suit in 1986, the court applied the 4–year statute holding that the "[p]laintiffs' claims, if any, accrued at the time of sale. The limitations period is four years. This action is time-barred." *Id.* at 822.

The plaintiffs have basically two responses to the defendants' arguments. The first is that all applicable statutes of limitation are tolled by the defendants' fraudulent concealment of the plaintiffs' causes of action, since the defendants took affirmative steps to lull the plaintiffs into failing to discover their cause of action within the limitations period. Secondly, the plaintiffs claim that the statutes of limitations on some of the plaintiffs' claims, namely the fraud, unfair and deceptive trade practices, negligent misrepresentation, and RICO, begin to run when the plaintiffs discovered or should have discovered their causes of action rather than on the date the artwork was delivered. The law is clear that with respect to these claims, the "discovery rule" is the appropriate application of the statute of limitations. *Cf.*, Footnote 19, where the court outlines the reason behind its adoption of the plaintiffs' argument on this point.

In support of the plaintiffs argument that the statute was tolled by the defendants' conduct, they point out that in equity, "a defendant cannot avail himself of the bar of the statute of limitations, if it appears that he has done anything that would tend to lull the plaintiff into inaction and thereby permit the limitation prescribed by the statute to run against him." *Mauian Hotel v. Maui Pineapple Co.*, 52 Haw. 563, 570–571, 481 P.2d 310 (1971). *See also, Beneficial Standard Life Insurance Co. v. Madariaga*, 851 F.2d 271 (9th Cir.1988) (equitable doctrine of fraudulent concealment as a tolling rationale arises when a defendant actively conceals its wrongdoing.) The application of the doctrine in the federal courts has the same effect—the statute of limitations is tolled until the plaintiff discovers or reasonably should have discovered that he or she had a cause of action. *Cunha v. Ward Food, Inc.*, 501 F.Supp. 830 (D. Hawaii 1980).

A related line of analysis would rely on the statutory extension of the statute of limitations for fraudulent concealment. Hawaii has specifically provided for extension of the statute of limitations if a person who would be liable for conduct fraudulently conceals the existence of the cause of action. Haw.Rev.Stat. § 657–20. Under this provision, an action may be commenced at any time within six years after the person who is entitled to bring the action "discovers or should have discovered, the existence of the cause of action ... although the action would otherwise be barred by the period of limitations."

Furthermore, the U.C.C. statute of limitations specifically provides that it "does not alter the law on the tolling of the statute of limitations." Haw.Rev.Stat. § 490:2–725(4). The doctrine of fraudulent concealment has been held to toll the 4–year statute of limitations contained in § 2–725. *Walsh v. Ford Motor Co.*, 616 F.Supp. 1170 (D.D.C.1985), *vacated on other grounds*, 807 F.2d 1000 (D.C.Cir.1986) (where automobile manufacturer was aware of product safety problems, but continually attributed complaints to driver's negligence, statute was tolled to the date

on which the plaintiffs should have known of the alleged defect); *Foodtown v. Sigma Marketing Systems, Inc.*, 518 F.Supp. 485 (D.N.J.1980) (in applying § 2–725, where a wrongdoer added to his original fraud by affirmatively attempting to deceive or mislead or prevent discovery of his act, the act would be given a continuing character which would not be cut off until its discovery by the plaintiff); *United States v. Pall Corp.*, 367 F.Supp. 976 (E.D.N.Y.1973) ("Cases interpreting section 2–725 of the Uniform Commercial Code have held that fraud will suspend the running of the statute of limitations.")

By continuing to send the plaintiffs a "Confidential Re–Appraisal—Certificate of Authenticity", the plaintiffs maintain that the defendants took such affirmative action as would prevent them from discovering the defendants' misrepresentations, and thereby lulled them into a false belief that no cause of action would lie. It is in just such instances that the doctrine of fraudulent concealment has applicability. And this is particularly the case where, as here, the defendants are seeking a summary disposition of the matter. *See Cunha v. Ward Foods, Inc.*, 501 F.Supp. 830, 836 (D.Haw.1980) ("the *possibility* that plaintiffs could show lulling or fraudulent concealment is sufficient to avoid summary disposition on the statues of limitation defenses.") (emphasis added).

There are three ways that this court might approach application of such a doctrine. The first would be to simply hold that the statute was tolled until the plaintiffs discovered their cause of action, i.e. to adopt the discovery rule relative to the application of the statute of limitations. The second would be to view the defendants' mailings as continuing conduct on their part which made the harm an ongoing one. Under this view, the cause of action would accrue no earlier than the date of the last mailing, 1987, and the plaintiffs cause of action would have been brought soon enough to satisfy even the 4–year statute provided by the UCC. Finally, the court could hold that the statute was tolled by reason of the defendants' conduct, viewing such conduct as fraudulent conceal-

ment of the plaintiffs' cause of action. The court now turns to an examination of each of these alternatives to determine which, if any, is applicable in the instant case.

1. *Statue of Limitations—The Discovery Rule*

■ As the defendants pointed out in the hearing held on this motion, the adoption of the discovery rule in application of the statute of limitations would require this court to reject contrary holdings in the cases of *Wilson v. Hammer Holdings, Inc.*, 850 F.2d 3 (1st Cir.1988); *Rosen v. Spanierman*, 894 F.2d 28 (2d Cir.1990); and *Firestone & Parson, Inc. v. Union League of Philadelphia*, 672 F.Supp. 819 (E.D.Pa.), *aff'd*, 833 F.2d 304 (3rd Cir.1987). The court made it quite clear that it was prepared to do so. This court is not bound by decisions coming out of the First, Second or Third Circuits except insofar as decisions emanating from courts within those circuits supply sound reasoning which the court may want to adopt. In the view of this court, far from being based on sound reasoning, these decisions flow from a too-literalistic application of the Code which takes no cognizance of the unique problem presented by the application of the U.C.C. to artwork and other collectibles; this is particularly true with works valued below the six-figure level. While this court recognizes the demand of uniformity when applying broad statutes of commercial application like the U.C.C., it rejects the defendants' invitation to simply apply the letter of the law with no thought whatsoever about the ramifications of such an application, a practice which, in the view of this court, was engaged in by the courts in *Hammer Holdings, Rosen*, and *Firestone*.

This court is in strong disagreement with the approach taken by its brethren in other Circuits; it is therefore incumbent upon it to lay out the reasons for that disagreement so as to enable future courts faced with this problem to weigh the strengths of the two approaches. The court will direct a few thoughts to the *Hammer Holdings* case, since it was the seminal case on the

Circuit Court level, and was followed by the other court in *Rosen*.

As was stated above, in the view of this court the decision in *Hammer Holdings* was based on a very literal reading of § 2–725. The court in that case wrote that in order for the statute of limitations not to apply, they would have to "ignore the literal language of the statute requiring an *explicit* promise of future performance." 850 F.2d at 5 (emphasis in original).[20] The court felt that any exception which would make works of art the type of good which by its very nature continued to 'perform' in the future by virtue of being an authentic Dali, or Vuillard (the artist in *Hammer Holdings*) would be a decision for the legislature. This court disagrees.

In two cases, noted by the *Hammer Holdings* court, courts inferred a warranty of future performance even where one was not specifically stated in the language used to make the warranty. The first is *Mittasch v. Seal Lock Burial Vault, Inc.*, 344 N.Y.S.2d 101, 42 A.D.2d 573 (1973). There, the warranty for a burial vault promised "satisfactory service at all times." The court reviewing such language held that "the very nature of the product" suggested future performance which would take the case out of the strictures of § 2–725. 344 N.Y.S.2d at 103.

The second case is *Moore v. Puget Sound Plywood, Inc.*, 214 Neb. 14, 332 N.W.2d 212 (1983). There, the parties agreed that "the description of the goods as 'siding' carried with it the representation that it would last the lifetime of the house." 332 N.W.2d at 214–215. That representation, according to Nebraska law,

created an express warranty that the goods would conform to the description, resulting in the court's conclusion that the defendant seller had promised future performance, specifically during the lifetime of the house. *Id.*

This court recognizes that, as a general statement of law on implicit warranties of future performance, these decisions might be viewed as the minority viewpoint.[21] However, this court does not now hold that the defendants' warranty of authenticity created an implied warranty as to future performance. Rather, this court holds that in the case of artwork which is certified authentic by an expert in the field or a merchant dealing in goods of that type, such a certification of authenticity constitutes an explicit warranty of future performance sufficient to toll the U.C.C.'s statute of limitations. U.C.C. § 2–725(2).

For the *Hammer Holdings* court to engage in such a literal application of § 2–725, or for it to defer such a question to the legislature, is an approach which can only be justified by the ease with which it can be adopted. It takes little judicial effort to make rote application of a statute without exploring the implications of such an application. Moreover, deferral of the question to the legislature is nothing more than a cop-out; this court acknowledges the truth in the axiom that hard cases make bad law, but does not agree that such is a justification for refusal to decide them.

However, this court wants to make clear that its holding applies narrowly to artwork as it comes under the regulation of the U.C.C.[22] But with respect to artwork,

---

**20.** § 2–725 contains an exception "where a warranty explicitly extends to future performance of the goods and discovery must await the time of such performance." In such a case, "the cause of action accrues when the breach is or should have been discovered." U.C.C. § 2–725(2).

**21.** In the federal courts, the cases of *Stumler v. Ferry–Moose Seed Co.*, 644 F.2d 667 (7th Cir. 1981); *Crouch v. General Elec. Co.*, 699 F.Supp. 585 (S.D.Miss.1988) and *Rockstroh v. A.H. Robins Co., Inc.*, 602 F.Supp. 1259 (D.Maryland 1985) have held that no implicit warranty of future performance would be viewed as tolling

the statute of limitations. In the state courts, *Nelligan v. Tom Chaney Motors, Inc.*, 133 Ill. App.3d 798, 88 Ill.Dec. 826, 479 N.E.2d 439 (1985); *Safeway Stores, Inc. v. Certainteed Corp.*, 687 S.W.2d 22 (Tex.App.1984); *Stoltzner v. American Motors Jeep Corp., Inc.*, 127 Ill. App.3d 816, 82 Ill.Dec. 909, 469 N.E.2d 443 (1984) and *Grand Island School District # 2 of Hall County v. Celotex Corp.*, 203 Neb. 559, 279 N.W.2d 603 (1979), have held similarly.

**22.** While the court does not now have before it a case involving wine or antiques, in the view of this court, such goods partake of the same nature as artwork, namely, they are of a type

this court views it as the type of thing about which questions as to authenticity normally arise only at some future time, usually the time of resale.

Since artwork does not "perform" in the traditional sense of goods covered by the U.C.C., and since the authenticity of a work of art, i.e. its "performance", would not change over time, Center Art's warranty necessarily guaranteed the present and future existence of the art as authentic works of Salvidor Dali. To force buyers to secure an additional warranty of future performance after an expert had certified a piece as genuine would be not only redundant, but ridiculous. The "Certificate of Authenticity" should be understood to provide what it said it did, an explicit warranty that the work was, and would be in the future, a Dali original. Based on such an explicit warranty of future performance, the statute is tolled until such time as the defect in the product was, or reasonably should have been, discovered.

One thing that a purchaser pays for when he buys artwork from a dealer such as Center Art is the expertise of the dealer and the dealer's promise of authenticity. This court will not require art purchasers to hire a second expert to verify the purported work of the first in order to preserve their rights under a future breach of warranty claim. This is especially the case where, as is often the situation with art, no test of the promise of authenticity is expected or required until a future time—namely, the time of future sale. When a promise comes from one deemed to be a reputable dealer, the buyer has no reason to doubt the authenticity of the artwork purchase. The representation of authenticity in the case of artwork is a warranty of future "performance," and that warranty should not be terminated solely because the dealer has been paid for the art. The purchaser has no reason to believe, nor should he, that a "authentic Dali" might cease being authentic solely because it has passed into his hands. And as has been shown in detail at the beginning of this opinion, no purchaser of art of the cost of the pieces at issue in this case would ever find it cost-effective to obtain verification of a dealer's representations from a second source.[23]

This court notes that the decision of the court in *Lawson v. London Arts Group*, 708 F.2d 226 (6th Cir.1983) adopted the discovery rule for application of the statute of limitations in a case, similar to the instant case, where a dealer had made a warranty of authenticity of a painting purchased by the plaintiff. This case was different from the instant case in that it

which may only be found to be genuine at some point far in the future, usually at the time of resale, and that given the cost of the goods relative to the costs of authentication, certification of authenticity by the initial buyer is normally prohibitively expensive or, in the case of wines, often precluded naturally for a period sufficient for the statute of limitations to have expired.

23. At the hearing on this matter, the court propounded the following hypothetical to illustrate the inherent difficulty when dealing with commodities such as artwork, antiques and wines in determining their authenticity prior to the time of resale, when the incentive to authenticate becomes sufficiently great as to justify some expenditure.

Suppose that a party was contacted by an established wine merchant who offered to sell one hundred cases of that year's vintage of Romanee Conti wine at $1,000 a case. Seeing a bargain, the party purchases 100 cases. Any discriminating buyer of such wine would know that it would not normally be tested within a period of 4 years, and even then more certainty

as to its rating and a higher price could be obtained by holding it longer. Indeed, the investment value of such a commodity would be maximized by holding it much longer, and periods of 10 to 30 years would not be outlandish. So the buyer holds the wine in excess of 4 years, and then opens a bottle; much to his surprise, he discovers that the wine is not Romanee Conti at all, but Algerian Rouge.

Under the *Hammer Holdings* view of the U.C.C. such a buyer would be without recourse against the party who defrauded him, even though he might not with any positive certainty have verified the wine as Romanne Conti at any time during the statute of limitations period. And while such an inherent preclusion in determining the quality of wine is not necessarily in place with regards to artwork, in cases like the one now before the court, the cost of the art when compared with the cost of authentication does not justify paying for a second opinion until there is the possibility of recouping that cost through resale.

took place in Michigan, and the court was asked to construe Michigan's Warranty in Fine Arts Statute, and specifically the applicable statute of limitations under that law, M.C.L.A. § 600.5833. Under that statute, the claim accrued at the time the breach of the warranty was discovered or reasonably should have been discovered. This is the same rule of law which this court adopts today.

"[W]here the issue of limitations requires determination of when a claim begins to accrue, the complaint should be dismissed only if the evidence is so clear that there is no genuine factual issue and the determination can be made as a matter of law." *Sisseton–Wahpeton Sioux Tribe v. U.S.*, 895 F.2d 588, 591 (9th Cir.1990) (citations omitted). For the reasons outlined above, this court now holds that in the case of artwork, a warranty of authenticity given by a merchant constitutes an explicit warranty of future performance sufficient to toll the statute of limitations provided in § 2–725 and that the cause of action for breach of that warranty and for breach of the warranty provided under § 2–313 of the Code. In instances such as those, the limitations period of a claim of a party seeking damages for breach of such warranty accrues at the time when the breach is discovered or reasonably should have been discovered.

### 2. *The Continuing Conduct of the Defendants*

■ A second approach this court could employ would be to view the conduct of the defendants as an ongoing course of conduct which extended beyond the actual sale of the paintings. Under this view, the plaintiffs' cause of action would accrue at the time of the breach of the defendants' warranties, and if those warranties were reiterated, then the claim would accrue at the time of the last reiteration.

Recall that § 2–313 provides for the creation of express warranties when:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. U.C.C. § 2–313.

Here, defendants sent the last "Confidential Appraisal—Certificate of Authenticity" to the plaintiffs in 1987. Viewing this act as a reiteration of the express warranty under § 2–313, the plaintiffs would have until 1991 to bring an action for damages based on a contention that such an express warranty had been breached. Since this action was filed in 1989, the plaintiffs were well within the four-year time limit. Accordingly, there is no cause for this court to view the action as time-barred.

### 3. *Fraudulent Concealment*

■ The final method of analysis of the facts presented is the one urged most strongly by the plaintiffs themselves, namely to view the defendants' continuing reiteration of their claim that the artwork was authentic as affirmative conduct which prevented the plaintiffs from discovering their cause of action. Under this theory, the "fraudulent concealment" of the defendants would act to toll the statute of limitations until such time as the plaintiffs could discover that they had been misled.

There is copious case authority to support the position advanced by the plaintiffs. "It was true [earlier], as it is today, that the fraudulent concealment of the facts giving rise to a claim tolled the controlling statute of limitations until full disclosure was made. Fraud did not entirely repeal the bar of limitations; rather the period of limitations simply did not run until the fraud was discovered, or at least discoverable." *Badaracco v. Commissioner*, 464 U.S. 386, 402, 104 S.Ct. 756, 766, 78 L.Ed.2d 549 (1983). *Accord, Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir.1987) (fraudulent concealment will toll statute of limitations where affirmative conduct by one party would lead the other party to believe that he did not have a claim); *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184,

1190 (9th Cir.1984) (continuing violation of the Sherman Act would serve to toll the statute of limitations); *N.L.R.B. v. Don Burgess Const. Corp.*, 596 F.2d 378, 382–383 (9th Cir.1979) (fraudulent concealment of a claim would toll statute of limitations on that claim and "[t]his equitable doctrine is read into every federal statute of limitation.")

With these cases in mind, this court finds that the action of the defendants in repeatedly sending the plaintiffs the certificates of authenticity and also representing to them that their investments were continuing to appreciate in value effectively prevented the plaintiffs from discovering their cause of action within the applicable statute of limitations. Because of this affirmative conduct on the part of the defendants, this court is compelled to exercise its equitable powers and view the statute of limitations as tolled for the period in which those representations continued to be made to the plaintiffs, namely, until 1987. Again, since the action was filed in 1989, there is no cause to dismiss it as being time-barred.

### IV. *Conclusion*

This court holds that the defendants' certification of the authenticity of the artwork sold to the plaintiffs served as an explicit warranty of future performance sufficient to toll the applicable statute of limitations. Furthermore, in cases of this type, where buyers are sold artwork of such a value that it would be prohibitively expensive to obtain a verification of authenticity in addition to the representations of the seller, and where the seller is a merchant of such artwork, the buyers are justified in relying on those representations and their claim for breach of warranty will accrue at the time they discover or reasonably should have discovered that the artwork was not authentic.

Furthermore, the defendants repeated mailings to the plaintiffs of certificates warranting the authenticity of the artwork sold to them made their conduct a continuing action which did not terminate until 1987. The plaintiffs' cause of action, filed in 1989, fell within the U.C.C.'s four-year statute of limitations.

Finally, the defendants' affirmative conduct in mailing the certificates of authenticity served to prevent the plaintiffs from discovering their claim against the defendants, and as such constituted fraudulent concealment of the plaintiffs' claims. In such circumstances, any applicable statute of limitations is tolled.

Based on all of the above reasons, the defendants' motion for judgment on the pleadings must be and hereby is DENIED. IT IS SO ORDERED.